UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

FILED
Scott L. Poff, Clerk
United States District Court
By jburrell at 5:02 pm, Mar 29, 2018

UNITED STATES OF AMERICA, )
)
v. ) CR417-251
)
SHAWN SIBERT, )
)
Defendant. )

REPORT AND RECOMMENDATION

After Defendant Shawn Sibert was stopped and arrested for various traffic offenses, Savannah police officers conducted a warrantless search of the vehicle that was then parked in the middle of the street. That search revealed the pistol that has led to his federal prosecution for felon-in-possession of a firearm. Doc. 3 (Indictment). Sibert challenges the legality of that search and his later confession, which he asserts is the tainted fruit of the initial illegality.

The government argues that the warrantless intrusion was a proper "inventory search" conducted after the police elected to impound and tow a vehicle that had come into their lawful custody, an election that was made prior to, and thus not dependent upon, the discovery of the firearm under the driver's seat. Sibert counters that the purported "inventory" was a mere pretext for a suspicionless search for evidence

that preceded any decision to impound the vehicle and, even if this were not the case, the inventory search was nevertheless unlawful because it was not conducted pursuant to established police policy. For reasons explained in the Court's Order of March 1, 2018 (doc. 40), the resolution of this issue required the Court to conduct two evidentiary hearings. Suppression hearing transcript ("Tr.") vol. 1 (February 14, 2018); *id.* vol. 2 (March 7, 2018). After considering the testimony at those hearings, the video/audio recordings made by the body cameras worn by the arresting officers, and the police inventory policy, the Court finds no violation of Sibert's Fourth Amendment rights. His motion to suppress, therefore, must be **DENIED**.

## I. DISCUSSION

The governing legal principles in this case, as clarified by the Court's March 1, 2018 Order (doc. 40), are not in dispute. The inventory search of an impounded vehicle is a well-established exception to the Fourth Amendment warrant requirement. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 369 n.5 (1976). "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to ensure against claims

of lost, stolen, or vandalized property, and to guard the police from danger." *Bertine*, 479 U.S. at 372; *Opperman*, 428 U.S. at 377 (the Fourth Amendment permits inventory searches of automobiles); *Illinois v. LaFayette*, 462 U.S. 640, 642 (1983) (inventory search of arrestee's shoulder bag serves the same governmental interests identified in *Opperman*). Such suspicionless searches are valid, provided they are conducted pursuant to standardized police procedures and the purported "inventory" is not "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990) (standardized criteria must sufficiently regulate inventory searches in order to ensure they are not turned into "'a purposeful and general means of discovering evidence of crime'"); *Bertine*, 479 U.S. at 370-72 (an inventory search may not serve as "'a subterfuge for criminal investigations.'").

As the Court explained in its earlier Order, while the subjective motivations of the police play no role whatsoever in assessing the Fourth Amendment reasonableness of a search based on probable cause or reasonable suspicion, *Whren v. United States*, 517 U.S. 806, 813 (1996) (adopting a purely objective test for assessing the validity of a

traffic stop), the actual motivations of the police *do matter* when considering the validity of inventory searches or other "administrative" searches that are allowable even in the absence of any justifiable suspicion of wrongdoing. *Id.*; *see Ashcroft v. al-Kidd,* 563 U.S. 731, 736 (2011). It is clear from the evidence – and this is not vigorously disputed by Sibert – that the police officers in this case did not act "in bad faith or for the sole purpose of investigation" when they elected to conduct an inventory search of the vehicle he was driving (but did not own). *Bertine*, 479 U.S. at 372. This finding is supported by the testimony of both witnesses at the evidentiary hearing, Officer Joseph Overholt and Sergeant Jeron Young, as well as the recordings made by the body cameras worn by Overholt and his ride-along trainee, Officer Jake Gilliland.

After observing Sibert weave in and out of his lane near the I-16/37th Street Connector in Savannah, Officer Overholt activated both his blue lights and his siren as a signal for the vehicle to pull over. Tr. vol. 1 at 18. The driver (Sibert) ignored this clear command and proceeded onward for some two-and-a-half blocks, making several turns onto other streets as he did so. *Id.* at 18-19. Sibert then stopped his

vehicle "slightly canted in the middle of" 36th Street, *id.* at 21, which is located in an area of Savannah (Cuyler-Brownsville) known for its high rate of violent crime. *Id.* at 19-20. Given these circumstances, Officer Overholt ordered Sibert (at gunpoint) to exit his vehicle and get on the ground. After some hesitation, Sibert, who was the vehicle's sole occupant, complied with the officer's command.[1] Sibert, who did not have a valid driver's license, advised Overholt that the car was owned by his girlfriend. *Id.* at 22. Overholt obtained her phone number and endeavored to call her, but he was unable to make contact. *Id.*

Officer Overholt then had a decision to make concerning the disposition of Sibert's vehicle, for Sibert was now under arrest and the vehicle's owner could not be located. While police policy clearly allowed the officer to tow and impound a vehicle upon the arrest of its driver, particularly where that vehicle was left blocking traffic, Officer Overholt initially tried to spare Sibert (and the vehicle's owner) both the trouble and expense of having a wrecker service tow and impound the vehicle. *Id.* at 23, 35. The bodycam videos reflect that Overholt

---

[1] While applying handcuffs Officer Overholt noticed that, momentarily at least, Sibert was shaking in a manner suggesting that he was having a seizure. Overholt therefore summoned EMS to the scene. After EMS examined Sibert and found him stable, he was placed in the back of Overholt's police car.

spent considerable time speaking with a neighbor or friend of Sibert's grandmother, who appeared on the scene and volunteered to move the car out of the roadway and park it at the curb. After running this bystander's driver's license to determine that it was valid, Overholt (with Sibert's consent) furnished her with the car keys for that purpose.

Before the bystander was allowed to enter the vehicle, Overholt's supervising sergeant, Jeron Young, interjected "Y'all gonna look through it first?" Video 20, file-2 ("Overholt Bodycam") at 16:32-33. After some further unintelligible exchange, Overholt stated, "Yeah, we'll do an inventory search." *Id.* at 16:40-44. Overholt's rookie officer then entered the vehicle and promptly located a pistol under the driver's seat. Overholt then called for a tow truck to remove the vehicle from the scene.

Overholt testified that, absent his sergeant's comment, he would have allowed the bystander-neighbor to move the vehicle to the curb and that, had this occurred, he would not have searched the vehicle. Tr. vol. 1 at 30, 32, 35. Overholt clearly treated his sergeant's comment more as a directive than a suggestion, and he interpreted that directive as meaning that he should conduct an inventory search prior to towing

the vehicle. *Id.* at 23, 31-32. Accordingly, after his sergeant made the comment, Overholt abandoned his initial plan of allowing someone to "legally park" the vehicle at the curb, *id.* at 23, and he instead elected the impoundment option permitted by police policy.[2] Also, Overholt testified that in no circumstance had he ever conducted an inventory search of a vehicle without towing that vehicle. *Id.* at 25. Despite defense counsel's suggestion to the contrary, Overholt insisted that he was determined to tow the vehicle even if no pistol had been found under the driver's seat. *Id.* at 34.

Officer Overholt "*assumed*" that his sergeant "was referring to an inventory search and knew that a tow must be made," *id.* at 32 (emphasis added), and he further assumed that his sergeant was "looking out for my best interest by saying go through that vehicle." *Id.* at 31. Overholt conceded that, in retrospect, he should not have considered allowing the bystander-neighbor to enter and park the vehicle, for the police policy states that only the vehicle *owner* may grant permission to the police to turn the vehicle over to a third party.

---

[2] As discussed below, the Savannah Police Department's (SPD) written impoundment policy states that whenever the driver of a vehicle is arrested, the officer has the "discretion" either to "impound the vehicle for safekeeping" or leave it "legally parked" at the request of the driver.

*Id.* at 35. At the time, however, Overholt's "mind was running one hundred miles an hour," and he was "trying to cater to the neighborhood" and do Sibert "a favor." Tr. vol. 1 at 35. He thought he was "doing the best thing" under the circumstances in arranging for the vehicle to be parked at the curb. *Id.* Sibert did not challenge any of this testimony, and the Court found it to be entirely credible.

Because the record established that it was Sergeant Young who prompted Overholt to conduct a search of the vehicle, the Court reopened the suppression hearing in order to receive evidence regarding Young's actual motivation for directing such a search. Doc. 40. At that hearing, Sergeant Young testified that he had "some concerns" about simply turning the vehicle over to a "lady from the neighborhood" without first conducting an inventory search of that vehicle. Tr. vol. 2 at 8. Young believed that the stated purposes behind the police department's inventory policy -- safeguarding the vehicle's contents and the protection of the police from later disputes or potential harm -- justify an inventory search whether officers elect to tow a vehicle or have someone move it to the curb. *Id.* at 9-10. Despite telling Overholt that the vehicle should be searched before the neighbor was allowed

access, *id.* at 10, 16, Sergeant Young explained that he left it up to the arresting officers whether to park the vehicle or have it impounded. *Id.* at 13, 18-20.

On the basis of the unrebutted testimony of the two police officers (the only two witnesses at the suppression hearing), the Court finds that neither officer "acted in bad faith or for the sole purpose of investigation," *Bertine*, 479 U.S. at 367, but instead were motivated by a desire to protect any valuable items located inside the vehicle. Obviously, the officers did not have the option of leaving the vehicle in the middle of the street, and given Sibert's arrest and the owner's absence, they either had to enter it themselves or allow someone else (be it a tow truck driver or friendly neighbor) to do so. The risk of property loss or damage, or possible harm arising from some dangerous item in the vehicle, was clearly uppermost in the mind of both officers. While Sergeant Young did suspect that there could be some type of incriminating evidence inside the vehicle, Tr. vol. 2 at 11, such back-of-the-mind suspicions do not vitiate an inventory search that is otherwise properly conducted for the proper purpose of safeguarding the owner's property and the police. *United States v. Khoury*, 901 F.2d 948, 959

(11th Cir. 1990); *United States v. Bosby*, 675 F.2d 1174, 1179 (11th Cir. 1982).

The absence of any improper purpose on the part of the officers is not the end of the inquiry, however. It is generally recognized that inventory searches are valid only if they are conducted pursuant to standardized procedures. *Wells*, 495 U.S. at 4-5 (lack of any police policy governing the opening of closed containers doomed the search of a suitcase found during an inventory search of a vehicle); *Bertine*, 479 U.S. at 372 (where the majority noted that the police "were following standardized procedures"); *id.* at 376 (concurring opinion by three justices, underscoring the importance of such standardized procedures); *Khoury*, 901 F.2d at 958; *United States v. Conaway*, 2016 WL 4508236, at *3 (S.D. Ga. Aug. 29, 2016). Sibert's principal argument is that the police acted in clear violation of that policy in this instance by choosing to inventory a car that they intended to park rather than impound, and he suggests that absent the discovery of the firearm they would not have had the car towed or impounded.

The Savannah Police Department (formerly the Savannah-Chatham Metropolitan Police Department) has a written policy

addressing the towing and impounding of privately owned vehicles. Doc. 37-2. Section VI of that policy provides that upon the arrest of a vehicle's driver, the arresting officer has the "discretion" either to impound the vehicle "for safekeeping" or leave the vehicle "legally parked at the request of the driver." *Id.* at 5 (SPD impoundment policy § VI.A). There is only one stated exception to the exercise of this broad discretion: even upon the driver's arrest, "the Officer shall not impound the vehicle" if the vehicle's "*owner*" authorizes another capable person "to take control of the vehicle in a reasonable amount of time." *Id.* (SPD impoundment policy § VI.B (emphasis added)). The police policy further provides that all towed vehicles must be inventoried, *id.* at 8 (SPD inventory policy § XI.D), and that "[t]he scope of the [inventory] search is not discretionary with the Officer," who must inspect "[a]ll areas of the vehicle, including closed containers and locked compartments." *Id.* at 7 (SPD inventory policy § XI.A).

Nowhere does the police inventory policy expressly authorize an arresting officer to conduct an inventory search of a vehicle that he elects to leave "legally parked" rather than have impounded. The evidence is clear, however, that Sergeant Young believed that the police

policy allowed for an inventory to be conducted in either circumstance. Tr. vol. 2 at 8-9 (stating his belief that the police were "required . . . by policy" to inventory search a vehicle before it was released to a wrecker company or before "turning it over to someone the arrestee actually chooses to turn it over to"); *id.* at 9-10 (the policies which justified the inventory search policy were applicable regardless of who took custody of the vehicle from the officers); *id.* at 22-27, 34, 36 (officers are required to inventory search both towed vehicles and vehicles entered by "third parties," whether they be private citizens or police officers). But when pressed to identify a specific policy provision that required or authorized an inventory search of a vehicle not being towed and impounded, Sergeant Young was unable to do so. *Id.* at 33-41.[3]

Sergeant Young's misunderstanding of the police inventory policy is not determinative, however, for that misunderstanding was neither conveyed to, nor was it shared by, Officer Overholt, and it was Overholt, not Young, who made the discretionary decision to impound rather than park the vehicle. In unrebutted (indeed, uncontested) testimony,

---

[3] Sergeant Young at one point referenced Section XI.D of the policy as authority for conducting an inventory of any vehicle before allowing a third party to take custody, *id*. at 38, but as pointed out to the sergeant during the hearing, that provision only applies to vehicles that have been towed.

Sergeant Young explained that while he directed his subordinate officers to search the vehicle, the decision whether to impound or park that vehicle was left entirely to Overholt's discretion. In fact, Sergeant Young never had any discussion with Overholt about the ultimate disposition of the vehicle. Thus, while Sergeant Young thought that the officers had policy-based authority to inventory search whether they elected to impound or park the vehicle, he did not discuss that erroneous belief with his subordinate officer. It was their arrest scene, and Sergeant Young saw no need to intervene into, or even inform himself about, the exercise of their discretion under SPD policy. So while it is true that Sergeant Young prompted Officer Overholt to proceed with an inventory search, the sergeant did not direct, or place any limits upon, Overholt's discretion as to what should be done with that vehicle after the inventory search was completed.

Initially, Overholt considered moving the vehicle out of the middle of the street, where it was blocking traffic, and leaving it legally parked at the curb, just as a police policy allowed him to do.[4] Tr. vol. 1 at 23.

---

[4] No provision of the police policy, however, authorized Officer Overholt to arrange for a third-party bystander (whatever their relationship to Sibert or his grandmother) to operate the vehicle for this purpose. As Overholt acknowledged during his testimony before this Court, the policy states that only the "vehicle *owner*"

Had that been accomplished, he would not have conducted an inventory search either before or after the vehicle was parked. *Id.* at 30; *id.* at 32 (Overholt's initial goal was to avoid an inventory search). His sergeant's comment—"Y'all gonna look through [the vehicle] first"—caused an immediate shift in Overholt's thinking. He "assumed [his sergeant] was referring to an inventory search and knew that a tow must be made." *Id.* at 32. Overholt concluded that "the only option [he had was] an inventory search prior to tow," and his body camera recorded him saying that he intended to proceed with an "inventory search." *Id.* at 23; *id.* at 35 (noting that his sergeant's comment "narrowed [his] options down to one"). Established police policy gave Overholt the discretion either to leave the vehicle "legally parked" *or* have it towed and impounded. Doc. 37-2 at 5 (SPD impoundment policy § VI.A).[5] While Overholt initially leaned in the direction of having

---

can authorize "another capable person" to take control of a vehicle upon a driver's arrest. Doc. 37-2 at 5 (SPD impoundment policy § VI.B (emphasis added)). Overholt testified that, in retrospect, he should never have considered allowing a third party to enter and move the vehicle. Tr. vol. 1 at 35. Sibert, of course, does not object to *this* deviation from police policy, for if Overholt had followed through with his original plan, there would have been no inventory of the vehicle and therefore no discovery of the firearm.

[5] Arguably, this provision of the police inventory policy assumes that the vehicle is "legally parked" at the moment the police encounter it, which was not the case here. Under this interpretation of the policy, Overholt would have been required at the outset to impound, and inventory, a vehicle that had been left in the middle of the

someone move the vehicle to the curb, he ultimately chose the impoundment option. The fact that his sergeant's comment proved instrumental to the exercise of Overholt's discretion is interesting, but it is not determinative here.

## II. CONCLUSION

It is undisputed that, from the outset of the traffic stop, the police had the discretion to impound and inventory a vehicle that had come into their lawful custody after its driver and lone occupant had been placed under arrest, particularly since the vehicle was blocking traffic and its owner could not be reached. Sibert nevertheless contends that the inventory search was improper because the officers failed to follow standardized procedures, and he argues that the decision to impound occurred only because a firearm was found. The evidence simply does not support this contention. The Court credits Officer Overholt's testimony that, in his mind, he had but one option once his sergeant prompted him to conduct an inventory search—tow and impound the vehicle. The Court further credits his testimony that he exercised that discretionary option before, not after, the gun was found. Because

street by a driver who was now under arrest and who could not himself allow any third party (be it police officer or helpful bystander) to enter and drive that vehicle.

established police policy allowed him to elect impoundment over parking under these circumstances, the inventory search violated none of Sibert's constitutional rights. Accordingly, his motion to suppress should be **DENIED**.

**SO REPORTED AND RECOMMENDED,** this 29th day of March, 2018.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA